STATE of Utah, Plaintiff and Appellee,

v.

Alan B. HADFIELD, Defendant and Appellant.

No. 880234.

Supreme Court of Utah.

Feb. 22, 1990.

D. Gilbert Athay, Salt Lake City, for defendant and appellant.

R. Paul Van Dam, Sandra L. Sjogren, Salt Lake City, for plaintiff and appellee.

DURHAM, Justice:

Defendant Alan Hadfield was convicted of four counts of sodomy on a child, first degree felonies, in violation of Utah Code Ann. § 76-5-403.1 (Supp.1987), and three counts of sexual abuse of a child, second degree felonies, in violation of Utah Code Ann. § 76-5-404.1 (Supp.1987). Defendant moved for a new trial, claiming that there was newly discovered evidence. After a hearing, the trial court quashed the documents filed in support of the motion for a new trial and denied it. Defendant filed this appeal.

Defendant's two young children testified at trial to various instances of sexual abuse. W. (a boy, born in 1975) and C. (a girl, born in 1977) said that their father had sodomized them, required them to perform acts of oral sex with him, and engaged in other sexual acts on several specific occasions. The other main witness for the prosecution was a therapist who had treated the Hadfield children and to whom the disclosures about defendant were initially made, Barbara Snow. Dr. Snow, who holds a Ph.D. in social work, testified at length about her treatment of the Hadfield children and her involvement with the Hadfield parents and others in their Lehi neighborhood whose children were being evaluated and treated for suspected sexual abuse. Dr. Snow was extensively cross-examined about her interviewing and treatment techniques.

Although defendant purports to challenge his convictions directly on appeal, his arguments for reversal in this appeal depend on his motion for a new trial. Appellate counsel suggested at oral argument in this matter that Barbara Snow's testimony had been so discredited as to require exclusion. We are unable, however, to see how such exclusion could have helped defendant with the jury in view of the testimony of the children themselves. The key to the defense at trial was to undermine the credibility of the children's stories by identifying Barbara Snow as the source and explanation for them. Defendant had to convince the jury either that the children were deliberately making false statements or that they wrongfully believed in the truth of what they said. His trial strategy was to demonstrate that Barbara Snow was an overzealous, unorthodox, aggressive "cru-

sader," who was willing to and did use subtle coercion and coaching to get her child patients to document a bizarre collection of sexually abberrant behaviors affecting an entire neighborhood. To this end, the testimony of Barbara Snow was essential to the defense and was put to good use by defendant's trial counsel and by defendant's expert medical witness. The medical witness, Dr. Stephen Golding, strongly and effectively criticized Dr. Snow's methods. He opined, for example, that the testimony of W. and C. had been irretrievably contaminated by the suggestive and coercive nature of Dr. Snow's techniques and was highly unreliable as a result. Defendant's strategy of undermining the believability of the children by attacking the practices of Barbara Snow was ultimately unsuccessful with the jury, but it does not appear that he had any other options.

■ For the foregoing reasons, the issue of new evidence relating to Barbara Snow's role in the allegations of the children in her treatment, including W. and C., is a critical one. The claimed new evidence includes (1) a doctoral thesis in which Barbara Snow discussed the use of authority and punishment to modify patient behavior, (2) testimony that she used this technique to modify the responses of her child patients to questions about sexual abuse, (3) testimony from law enforcement personnel that false information deliberately "fed" by them to Barbara Snow in their investigatory work promptly appeared in the statements of children she interviewed, and (4) a highly suspicious correlation between the factual patterns revealed in at least four child sex abuse investigations in which Barbara Snow was involved. The first three categories of "new" evidence are problematic for various reasons. The doctoral thesis was written long before the trial of this case and was therefore at least theoretically available to the defense.[1] With respect to the second and third categories of "new" evidence, we conclude that the State is correct in characterizing them as cumulative rather than new. Defendant offered several witnesses at trial who described the suggestive and coercive interviewing techniques allegedly utilized by Dr. Snow and one police officer who described how the children in Dr. Snow's care were able to reproduce specific information after he had suggested to Dr. Snow that such information should be present in their statements. Additional testimony about these matters might enhance defendant's chances for acquittal, but standing alone, would not qualify as newly discovered evidence warranting a new trial.

■ We are more concerned, however, about the last category of claimed evidence. As discussed above, defendant's only chance at this trial was to convince the jury that he did not do what his children said he did, which in turn required an explanation of why the children would say he had done it if he had not. The defense's logical strategy was to highlight the bizarre and unusual things said by the Hadfield children and by numerous other neighborhood children to their therapist Barbara Snow and to establish Barbara Snow as the likely source of accusations against defendant. In that regard, it is important to note that the record contains considerable testimony about the investigations and therapy conducted by Barbara Snow and the police in the Hadfields' immediate neighborhood for nearly a year prior to the time defendant was named as a perpetrator. Defendant himself, along with his wife, had initiated treatment of his children by Barbara Snow because of allegations by other neighborhood children about widespread sexual molestation. Eventually, in Barbara Snow's interviews with the Hadfield children and others, a total of at least fifteen adults and fifteen children were identified as participants in various unusual sexual activities, including instances of group abuse of children by adults. The activities described by the children involved

---

**1.** We note, however, that when asked at trial whether she had written a doctoral thesis, Dr. Snow responded by saying that she had written a "master's thesis" (on a different topic) and did not mention the essay in question. We cannot tell from the record whether there was simply a misunderstanding between defense counsel and Dr. Snow or whether she intended that he not become aware of the subject of her doctoral research.

satanic ritual, costumes and masks, photography equipment, men dressing in women's clothing, and frequent episodes of playing with and consuming human excrement. A specific instance of abuse related to Dr. Snow by W. and described by her at trial, for example, involved defendant's removing feces from W.'s rectum with a spoon and forcing him to play with it.

The trial court quashed an affidavit filed by defendant in support of his motion for a new trial and declined to permit defendant an opportunity to produce evidence relating to its allegations. The affidavit had been prepared by a "paralegal/investigator" who had investigated "four separate alleged child abuse cases in which Barbara Snow or an employee of ISAT [Intermountain Sexual Abuse Center] was or is a percipient witness." The affidavit details the following bizarre factual correlations between those cases and the case resulting in defendant's trial: (1) they all involve a neighborhood "sex ring" of from three to twenty families; (2) they all involve members of the same church, including a significant number of religious leaders; (3) they all involve satanic rituals and neighborhood "sex parties"; and (4) in all of the cases, children taken to Barbara Snow at ISAT for counselling have in turn identified other children and adults in the neighborhood. In addition, the affidavit claims that several nearly identical allegations exist in several of these cases. Three of the cases allegedly include prominent reference to playing with, consuming, and bathing in human excrement. Pictures drawn by some of the children in treatment with Barbara Snow in two of the cases are claimed to be identical. Men dressing in women's clothing and the use of costumes and masks were described by children in two of the cases. In three cases, the children described large groups of adults congregating for the purpose of touching naked children and referred to the use of candles and pentagrams for satanic rituals. The affidavit further alleges that no known connection exists between any of the cases except for the involvement of Barbara Snow and ISAT in the investigations and the inability of law enforcement to discover any corrob-orating evidence of the group activities (such as photographs, paraphernalia, etc.).

The State moved to quash the affidavit on the ground that the foregoing information would be inadmissible in a trial of defendant because it is not relevant to the charges against him and because "it would have complicated the trial beyond permissible bounds." The State also challenged numerous statements in the affidavit as lacking foundation and constituting hearsay. The foundational objections to the affidavit may be well-taken in some instances, but defendant was, in our view, entitled to the opportunity to present evidence to substantiate its claims, assuming he could establish adequate foundation and avoid hearsay problems.

The State's claims that the proffered evidence would be irrelevant to defendant's defense and must be excluded because it would impossibly complicate a new trial appear to us to be somewhat disingenuous. The jury in this case was confronted with a strange and troubling scenario. If the children were not telling the truth, what possible reason could there be for them to fabricate such bizarre information? On the other hand, if they were telling the truth about defendant, presumably they were telling the truth about the neighborhood activities as well. The jury here apparently opted to accept the latter alternative. If the jury had been informed that the astonishing constellation of perversions and abuses described by the Hadfield children in Lehi also occurred, in highly similar detail, in three other unrelated locales, might they not have decided that the first alternative was the less shocking and more believable, particularly if persuaded that Barbara Snow was the common denominator? That is, in any event, defendant's theory. The State is concerned because it will have to counter defendant's theory with proof that an alternative theory (namely, that the described abuse actually occurred in all of the cases) explains the coincidence. It also claims that some of the information it would be required to use in that effort is "privileged." We know of no principle of law limiting a defendant's exploration of

facts in his defense because the State refuses or is unable to adduce other facts in rebuttal.

Defendant has been convicted of seven felonies involving crimes of the most terrible and reprehensible nature. It is essential that those convictions be supported by an unimpeachably fair and even-handed process. Defendant's allegations about new evidence relating to the credibility of Barbara Snow and the children on his motion for a new trial were adequate to create the need for an evidentiary hearing and the creation of a record upon which this Court could review the ruling on that motion. We therefore vacate the trial court's denial of the motion for a new trial and remand this case for an evidentiary hearing on that motion, including of course the question of whether defendant's proffered evidence may properly be regarded as newly discovered. Defendant, of course, will be required to comply with the Utah Rules of Evidence in his offers of evidence. Because of the continuing pendency of that motion in light of this holding, we do not address further any of defendant's challenges to the underlying convictions.

HOWE, Associate C.J., and DAVIDSON, Court of Appeals Judge, concur.

HALL, Chief Justice (dissenting):

I dissent because I am not persuaded that the Court abused its discretion in denying defendant's motion for a new trial. As was observed in *State v. Harris*,[1]

> The denial of [a motion for a new trial on the ground of newly discovered evidence] will be deemed an abuse of discretion only in such instances where there is a grave suspicion that justice may have been miscarried because of the lack of enlightenment on a vital point, which the new evidence will supply; and the other elements attendant on obtaining a new trial on the ground of newly discovered evidence are present. If there be evidence before the court upon which reasonable [persons] might differ as to whether or not the defendant is guilty, the trial court may deny a motion for a new trial.

The evidence defendant sought to introduce in support of his motion for a new trial was not in fact newly discovered evidence.[2] Rather, it was cumulative, irrelevant, or inadmissible.[3] It was therefore insufficient to support his motion.[4]

ZIMMERMAN, J., concurs in the dissenting opinion of HALL, C.J.

STEWART, J., does not participate herein; DAVIDSON, Court of Appeals Judge, sat.

---

1. 30 Utah 2d 77, 80, 513 P.2d 438, 439–40 (Utah 1973).

2. *State v. Williams*, 712 P.2d 220 (Utah 1985).

3. *State v. Gellatly*, 22 Utah 2d 149, 449 P.2d 993 (Utah 1969).

