**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 23 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ARDEN BRETT BULLOCK,

      Petitioner-Appellant,

v.

SCOTT CARVER, Warden, Utah State
Prison,

      Respondent-Appellee.

No. 00-4023

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. No. 2:92-CV-680-B)**

---

Submitted on the briefs:[*]

Craig S. Cook, Attorney, Salt Lake City, Utah, for Petitioner-Appellant.

Thomas B. Brunker, Assistant Attorney General and Jan Graham, Utah Attorney
General, Salt Lake City, Utah, for Respondent-Appellee.

---

Before **EBEL**, **ANDERSON**, and **KELLY**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

[*]    After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of
this appeal.  See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case
therefore is ordered submitted without oral argument.

In December 1986, a Utah jury convicted petitioner-appellant Arden Brett Bullock of three counts of aggravated sexual abuse of a child and three counts of sodomy upon a child. The state trial court subsequently sentenced him to a minimum mandatory prison term of fifteen years to life on each sodomy count and nine years to life on each sexual abuse conviction, with the sentences to run concurrently. The Utah Supreme Court upheld Mr. Bullock's conviction by a three-to-two vote in 1989, see State v. Bullock, 791 P.2d 155 (Utah 1989), and the United States Supreme Court denied Mr. Bullock's petition for certiorari in 1990. See Bullock v. Utah, 497 U.S. 1024 (1990). Two years after the Supreme Court rejected Mr. Bullock's appeal, Mr. Bullock filed, pursuant to 28 U.S.C. § 2254, a petition for writ of habeas corpus with the United States District Court for the District of Utah alleging that during his trial he received ineffective assistance of counsel and that his rights under the Due Process Clause and Confrontation Clause had been violated.

Over several months in 1996, the magistrate judge held a four-day evidentiary hearing on Mr. Bullock's ineffective assistance of counsel claim. Three years later, the magistrate judge issued a 105-page report and recommendation rejecting all three claims for relief. Despite numerous objections from Mr. Bullock, the district court adopted the report and recommendation,

denied Mr. Bullock habeas relief, and rejected Mr. Bullock's subsequent motion for a certificate of probable cause to appeal his habeas petition to this court.

This appeal followed. We now grant a certificate of appealability for each of the issues Mr. Bullock raises on appeal and affirm the denial of habeas relief. In reaching this conclusion, we reemphasize that the ultimate inquiry when deciding whether an attorney performed in a constitutionally deficient manner is not whether the counsel's actions can be considered strategic, but whether, under all the circumstances, counsel's actions may be considered objectively reasonable.

## I. Background

The facts of this case have been fully described by the Utah Supreme Court, the magistrate judge's report and recommendation, and the parties' briefs on appeal. Therefore, we provide only a brief summary of the underlying events.

In 1985, one of Mr. Bullock's former neighbors in Bountiful, Utah, took her four-year old son to see Dr. Barbara Snow, then clinical director of the Intermountain Sexual Abuse Treatment Center (ISAT), because of inappropriate sexual remarks he had made to two fellow four-year-olds. Mariam Smith, also a former neighbor of Mr. Bullock's and then ISAT's overall director, referred the boy to Dr. Snow, a "child therapist with a Ph.D. in social work, who worked with child victims of sexual abuse." During his second meeting with Dr. Snow, the

boy alleged that he had been sexually assaulted by two eight-year-old boys from the neighborhood, one of whom was Mr. Bullock's son. Eventually, Dr. Snow interviewed the eight-year-old boys, and one alleged that Mr. Bullock had sexually molested him and several other neighborhood children, including Mr. Bullock's eight-year-old son and twelve-year-old daughter. As word of the alleged abuse spread throughout the neighborhood, other boys were brought to see Dr. Snow, who, with only a few exceptions discussed below, did not record her interviews with the children or otherwise document what occurred during the interview sessions, despite requests from a local police detective and a child psychologist that she do so. During their initial interviews with Dr. Snow, several of the boys denied that they had been abused by Mr. Bullock. Eventually, however, four boys alleged that Mr. Bullock had engaged in criminal sexual acts with them two years earlier, when the boys were six or seven years old. The boys also told Dr. Snow that Mr. Bullock had threatened to harm them, their families, and their pets.

Although Dr. Snow documented few of her interviews,[1] she did conduct two interviews in the presence of state officials. In October 1985, Dr. Snow interviewed one of the boys at the Salt Lake County District Attorney's Office. Approximately two months later, on December 13, 1985, Dr. Snow met with three

___
[1]Dr. Snow apparently audiotaped one interview with one of the boys.

of the boys, the three boys' parents, a Bountiful police detective, and two county attorneys from the Salt Lake County Attorney's Office. During this meeting, Dr. Snow interviewed "the boys one at a time in front of each other and the other people present." Two of the children described incidences of abuse that corresponded with what they had previously told Dr. Snow, but one boy, who had been pressured by his father to report the incident, denied that he had been abused.

Eventually, all four boys were referred to Dr. Ann Tyler, "a psychologist and Executive Director of the Family Support Center, an agency dedicated to the prevention and treatment of child abuse and neglect," who performed "corroborative assessments" that were designed "to collect sufficient data [so that she could give] an opinion as to whether the boys had been abused. One of the boys initially told Dr. Tyler that he felt pressured to accuse Mr. Bullock of abuse, informing Dr. Tyler that he accused Mr. Bullock to appease his father, that he could not recall the alleged abuse, and that Dr. Snow had told him he had been abused. Nevertheless, Dr. Tyler, who, unlike Dr. Snow, recorded her interviews, concluded that, in all likelihood, all four boys had been abused.

Utah subsequently charged Mr. Bullock with abusing the boys. A jury tried Mr. Bullock in December 1986, and two attorneys represented Mr. Bullock throughout the proceedings. During the trial, Dr. Snow and Dr. Tyler described

their interviews with the boys and recounted the boys' statements indicating that they have been sexually molested by Mr. Bullock. In addition, Dr. Tyler opined that the boys had been sexually abused. The four boys all testified via videotaped deposition that they had been molested by Mr. Bullock. Several of the boys' parents described behavioral changes in their children after the alleged abuse occurred but before the meetings with Dr. Snow.

The defense responded to the prosecution's case by arguing that Dr. Snow planted the allegation of abuse by Mr. Bullock in the boys' minds. In making their case, Mr. Bullock's defense attorneys relied, in part, on Dr. Snow's own statements during trial. Dr. Snow testified, for example, that she was "very aggressive in [her] questioning of children," that she was "relatively indifferent to what [would] happen to the [alleged] perpetrator," that she did not approach interview sessions "with an open mind" but as an "ally for the child," and that she did not see herself as a fact collector like the police." Dr. Snow also testified extensively about her interview techniques, and she acknowledged that she did not record her interviews with the children, take notes during the interviews, or write reports following the interviews. Indeed, Dr. Snow admitted that her "own integrity" was the only way of verifying what had occurred during the interview sessions. Similarly, the defense team emphasized contradictions and

inconsistencies in the boys' testimony, including the fact that one of the boys had retracted an allegation of abuse as being untrue.

The defense attorneys also called three expert psychologists who severely criticized Dr. Snow's interviewing techniques and asserted that her methods had irreparably tainted not only the boys' testimony, but their actual recollections of events. In addition, the defense experts challenged Dr. Tyler's conclusion that the boys had been abused, arguing that the boys had already been contaminated by Dr. Snow by the time Dr. Tyler evaluated them.

Mr. Bullock also took the stand in his own defense, denying any improper behavior toward the boys or any other child. Similarly, his daughter testified and denied that she had been involved in any sexual activity with her father or with any of the boys, as the boys had alleged. She also described her interview with Dr. Snow wherein Dr. Snow attempted to coerce her to admit that she had been sexually abused.

Ultimately, the jury convicted Mr. Bullock of three counts of aggravated sexual assault and three counts of sodomy upon a child, but acquitted him on one charge of aggravated sexual assault and two counts of sodomy upon a child.

## II.  Jurisdiction and standard of review

The district court had jurisdiction over Mr. Bullock's habeas petition under 28 U.S.C. § 2254.  Because Mr. Bullock appealed the denial of his habeas petition after the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) became effective, we may only address issues for which a certificate of appealability has been granted.  See id. § 2253(c)(1); Slack v. McDaniel, 529 U.S. 473, 481-82 (2000); Moore v. Marr, 254 F.3d 1235, 1238 (10th Cir.), cert. denied, 122 S. Ct. 670 (2001).  The district court declined to grant a COA on any of the issues raised in this appeal.  Nonetheless, we may grant a COA and consider the underlying merits of the appeal, if Mr. Bullock "demonstrate[s] that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack, 529 U.S. at 484.  For the reasons outlined below, we find that on each claim Mr. Bullock "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and, therefore, we conclude that reasonable jurists "would find the district court's [decision] . . . debatable or wrong."  Slack, 529 U.S. at 484.  Consequently, we grant a COA on each of the three issues raised in Mr. Bullock's habeas petition.

However, because Mr. Bullock filed the underlying habeas petition before the enactment of the AEDPA, we apply pre-AEDPA law when reviewing the merits of his habeas petition.  See Tillman v. Cook, 215 F.3d 1116, 1121 (10th

- 8 -

Cir. 2000). Under pre-AEDPA law, "we presume state court factual determinations to be correct," and where, as here, the federal district court made factual findings after holding an evidentiary hearing, we review those findings "for clear error." Romero v. Tansy, 46 F.3d 1024, 1028 (10th Cir. 1995). In either situation, we review the district court's "conclusions of law de novo." Tillman, 215 F.3d at 1121. Finally, "[w]e may grant relief to a state prisoner only if state court error deprived him of fundamental rights guaranteed by the Constitution of the United States." Id. (quoting Brown v. Shanks, 185 F.3d 1122, 1124 (10th Cir. 1999) (further quotations omitted)).

### III. Ineffective Assistance of Trial Counsel

Mr. Bullock devotes the overwhelming majority of his eighty-six page opening brief to arguing that he received ineffective assistance from his trial counsel, thus violating his rights under the Sixth Amendment. Although Mr. Bullock spends a great deal of time discussing his ineffective assistance of counsel claim, his arguments, at their core, center around his trial attorney's failure to object to various pieces of evidence introduced by the state during trial. Specifically, Mr. Bullock argues that his trial counsel erred by not trying to exclude as unreliable the children's hearsay testimony presented through police officers, the children's parents, and Drs. Snow and Tyler. He also contends that

his trial counsel acted ineffectively by not objecting to the children's direct testimony under Rule 403 of the Utah Rules of Evidence.[2]

## A.  Legal Standards

In determining whether a habeas petitioner's trial counsel acted ineffectively, we apply the general ineffective assistance of counsel standard identified by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984).  See Romano v. Gibson, 278 F.3d 1145, 1151 (10th Cir. 2002) (applying Strickland).  Under Strickland, a petitioner must satisfy a two-part test in order to prevail on an ineffective assistance of counsel claim.  First, he must demonstrate that his attorney's "performance was deficient" and "fell below an objective standard of reasonableness."  Strickland, 466 U.S. at 687-88.  In applying this test, we give considerable deference to an attorney's strategic decisions and "recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  Id. at 690.  Second, a habeas petitioner must show that the trial counsel's deficient performance prejudiced him, which requires a showing that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.

---

[2]Unless otherwise noted, Utah's Rules of Evidence are identical to the Federal Rules of Evidence.

Whether a petitioner's claim satisfies <u>Strickland</u>'s two-part test is a mixed question of law and fact we review de novo. <u>Boyd v. Ward</u>, 179 F.3d 904, 913 (10th Cir. 1999).

## B. <u>Trial Counsel's Strategy</u>

After hearing testimony from Mr. Bullock's trial attorneys, the magistrate judge found that Mr. Bullock's defense team assumed that the children's direct testimony could not be excluded and believed that the children would come across as highly credible witnesses. Consequently, Mr. Bullock's attorneys developed their defense around the assumption that the children's direct testimony would be admitted into evidence and that Mr. Bullock would have to explain why the children would accuse him of sexual abuse. Ultimately, according to the magistrate judge and the district court, the defense attorneys concluded that, instead of directly attacking the children's credibility, it would be most effective to argue that the children came to believe they had been abused by Mr. Bullock through (1) their repeated exposure to stories attributing the abuse to Mr. Bullock and (2) Dr. Snow's aggressive interviewing tactics. As the magistrate judge explained,

> In summary, counsel's theory of the defense was that the children's stories of molestation by petitioner were the product of improper interview techniques and coercion by Dr. Snow and contamination by their exposure to discussions of the molestation among themselves, their parents, and at the meeting at the county attorney's office.

- 11 -

"In deciding how best to present th[is] defense, counsel considered different scenarios," including the exclusion of the children's hearsay testimony, the magistrate judge found. Eventually, the attorneys reasoned that if the children's hearsay testimony were excluded from the prosecution's case in chief, it would ultimately be admitted in the prosecution's rebuttal case "to rehabilitate the child witnesses' credibility after the defense had attacked it through the cross-examination of Drs. Snow and Tyler." Therefore, Mr. Bullock's trial counsel concluded, according to the magistrate judge and district court, that the hearsay testimony should come in during the "prosecution's case-in-chief rather than to give the appearance to the jury and the court that they were trying to hide something." Although the defense team also considered seeking a limiting instruction that would inform the jury that the children's hearsay statements could only be considered in "evaluating Dr. Snow's interview techniques and not for the truth of the matter asserted," they declined to do so because (1) they wanted to use any favorable hearsay testimony for the truth of the matter asserted and (2) feared the limiting instruction might confuse the jury, particularly if some statements were admitted for the truth of the matter asserted while others were not.

In addition, Mr. Bullock's trial counsel believed other advantages could be derived from not excluding the children's hearsay testimony. First, the hearsay

statements revealed that the children only suggested that Mr. Bullock had abused them after they had met with Dr. Snow. Second, the hearsay statements demonstrated inconsistencies and contradictions within the children's allegations and the possibility that outside pressure influenced their stories.[3]

Mr. Bullock forthrightly concedes that the "strategy as presented by the Magistrate Judge and the lower court makes sense in the abstract and certainly would insulate [Mr. Bullock's attorneys] from any claim of ineffectiveness had such decisions been properly made with understanding and information." See Strickland, 466 U.S. at 689-90. Mr. Bullock, however, argues that the admission of the children's direct testimony and the children's hearsay testimony cannot be considered a reasonable strategic choice because Mr. Bullock's "attorneys were not aware of legal options available from which to make strategic choices."[4]

---

[3] Dr. Tyler, for example, testified that one victim told her that he felt pressured to assert that Mr. Bullock had abused him and that he did not specifically recall the incidences of abuse. Moreover, Dr. Tyler's testimony revealed that nearly all of the children initially had trouble remembering whether incidences of abuse occurred, with some initially denying altogether that Mr. Bullock had sexually assaulted them.

[4] At least with regard to the children's hearsay testimony, it is not entirely clear that Mr. Bullock's claim is factually correct. As will be discussed in the following sections, our review of the record suggests that Mr. Bullock's trial counsel did not know that the children's hearsay statements could be challenged under a Utah statute governing the admission of "a child victims's out-of-court statement regarding sexual abuse of that child." Utah Code Ann. § 76-5-411(1). However, it is also clear from the record that Mr. Bullock's trial attorneys did know that, under general evidentiary rules, they could challenge the use of at least

(continued...)

- 13 -

Although we discuss his specific claims more below, Mr. Bullock essentially argues that his attorneys were unaware of Utah evidentiary rules that could have been used to challenge the admissibility of the boys' direct and hearsay testimony. Mr. Bullock appears to argue that his attorneys' unawareness rendered their performance constitutionally deficient.[5]

C.  Role of Presumptions in Ineffective Assistance of Counsel Analysis

A threshold issue underlying Mr. Bullock's ineffective assistance of counsel argument, then, is how trial counsel's alleged strategy, or lack thereof, influences our analysis under Strickland's deficient performance prong.  As will be discussed below, the overriding question under the first prong of Strickland is whether, under all the circumstances, counsel performed in an objectively unreasonable manner.  Two presumptions inform our objective reasonableness inquiry.  First, we always start the analysis that an attorney acted in an objectively

---

[4](...continued)
some the hearsay evidence, but elected not to do so for strategic reasons. Consequently, at least in regard to the hearsay evidence, we disagree with the notion that Mr. Bullock's attorneys acted in complete ignorance of the possibility of excluding the children's hearsay statements.

[5]      There is some tension in Mr. Bullock's argument.  On the one hand, Mr. Bullock suggests that a fully informed attorney could have employed the strategy that his attorneys used.  Later in his brief, however, he seems to retract his earlier concession, arguing that the failure to challenge the children's direct and hearsay statements "is clearly below the standard of competent counsel."  For reasons discussed below, we do not believe that Mr. Bullock's trial attorneys performed in an objectively unreasonable manner.

reasonable manner and that an attorney's challenged conduct <u>might</u> have been part of a sound trial strategy. Second, where it is shown that a particular decision was, <u>in fact</u>, an adequately informed strategic choice, the presumption that the attorney's decision was objectively reasonable becomes "virtually unchallengeable." However, it is important to remember that these presumptions are simply tools that assist us in analyzing <u>Strickland</u>'s deficient performance prong and they do not, in and of themselves, answer the ultimate question, which is whether counsel performed in an objectively reasonable manner. So, for example, even though counsel's strategy was ill-informed and thus does not qualify for the virtually unchallengeable presumption of reasonableness, a court reviewing the record before it might still conclude that counsel performed in an objectively reasonable manner. And, conversely, it is also possible on rare occasions to conclude that counsel's fully-informed strategic choices were unreasonable if "'the choice was so patently unreasonable that no competent attorney would have made it.'" <u>Phoenix v. Matesanz</u>, 233 F.3d 77, 82 n.2 (1st Cir. 2000) (quoting <u>Washington v. Strickland</u>, 693 F.2d 1243, 1254 (5th Cir. 1982)).

### 1. <u>General Presumption of Reasonableness</u>

As we have often explained, a petitioner raising an ineffective assistance of counsel claim carries a "heavy burden." <u>E.g.</u>, <u>Gonzales v. McKune</u>, 247 F.3d

1066, 1072 (10th Cir. 2001), vacated in part on other grounds by Gonzales v. McKune, 279 F.3d 922 (10th Cir. 2002) (en banc), petition for cert. filed (U.S. May 7, 2002) (No. 01-10243); Fox v. Ward, 200 F.3d 1286, 1295 (10th Cir. 2000).  Generally speaking, "[t]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" Romano, 278 F.3d at 1151 (quoting Strickland, 466 U.S. at 689); see also Brecheen v. Reynolds, 41 F.3d 1343, 1365 (10th Cir. 1994) (explaining "presumption that counsel's conduct was constitutionally effective"); United States v. Haddock, 12 F.3d 950, 955 (10th Cir. 1993) ("[P]roof [of deficient performance] must overcome the 'strong presumption' that counsel was effective.") (citation omitted).  This presumption derives from our common experience that attorneys, as a whole, usually represent their clients in a professional, competent, and reasonable manner.  See, e.g., Bell v. Cone, 122 S.Ct. 1843, 1863 (2002) (Stevens, J., dissenting) ("[A] presumption that every lawyer in every capital case has performed ethically, diligently, and competently is appropriate because such performance characterizes the members of an honorable profession.").

Put another way, the Supreme Court has explained, the general presumption of objective reasonableness requires a petitioner to "overcome the presumption that, under all the circumstances, the challenged action 'might be considered

- 16 -

sound trial strategy.'" Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)) (emphasis added); see also Kimmelman v. Morrison, 477 U.S. 365, 385 (1986) (applying Strickland presumptions); Romano, 278 F.3d at 1151 (noting general presumption of effectiveness requires petitioner to overcome presumption the counsel have acted as he did for valid strategic reasons); Boyd, 179 F.3d at 914 (explaining that, in light of the presumption of effectiveness, a petitioner must overcome presumption that challenged actions might have been part of a sound trial strategy).  Thus, the Strickland decision "places upon the defendant the burden of showing that counsel's action or inaction was not based on a valid strategic choice."  Wayne R. LaFave et al., Criminal Procedure § 11.10(c) at 715 (West 2d 1999); see also Darden v. Wainwright, 477 U.S. 168, 186-87 (1986) (discussing presumption that counsel acted strategically); Gonzales, 247 F.3d at 1072 (explaining that ineffective assistance of counsel claimant must "overcome the presumption that defense counsel's actions were sound trial strategy"); Fox, 200 F.3d at 1295 (same).  Thus, when we review an ineffective assistance of counsel claim, we start by presuming, absent a showing to the contrary, that an attorney's conduct is objectively reasonable because it could be considered part of a legitimate trial strategy.  Boyd, 179 F.3d at 914.

## 2. Presumption of Reasonableness where Attorney Made Adequately Informed Strategic Choice

Beyond the general presumption of objective reasonableness, Strickland further presumes that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." 466 U.S. at 690; see also Barrett v. United States, 965 F.2d 1184, 1193 (1st Cir. 1992) (distinguishing between presumption that counsel acted objectively reasonably and in a way that might be considered strategic and presumption of validity for strategic choices made after thorough investigation). Indeed, we have explained that "[s]trategic or tactical decisions on the part of counsel are presumed correct, unless they were completely unreasonable, not merely wrong." Moore, 254 F.3d at 1239 (citations and quotation omitted); see also Romano, 278 F.3d at 1151 (explaining the difficulty in challenging an attorney's strategic choices). Unlike the general presumption that an attorney acted objectively reasonably because his decision might have been made for legitimate strategic reasons, which automatically applies in all cases, Strickland, 466 U.S. at 689, this second, "virtually unchallengeable" presumption of reasonableness operates only where it is shown (1) that counsel made a strategic decision and (2) that the decision was adequately informed. Id. at 690-91.

### 3. Ultimate Inquiry into Objective Reasonableness

Strickland's presumptions–the presumptions (1) that counsel's actions were objectively reasonable because they might have been part of a sound trial strategy and (2) that actual strategic choices made after thorough investigation are "virtually unchallengeable," Strickland, 466 U.S. at 689-90–should not obscure the overriding, and ultimately determinative, inquiry courts must make under Strickland's deficient performance prong: whether, after "considering all the circumstances," counsel's performance fell "below an objective standard of reasonableness." Id. at 688; see Darden, 477 U.S. at 184; Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000); Fisher v. Gibson, 282 F.3d 1283, 1292 (10th Cir. 2002); Brecheen, 41 F.3d at 1365; Denton v. Ricketts, 791 F.2d 824, 826 (10th Cir. 1986). As the Supreme Court recently explained when discussing Strickland's first prong, "[t]he relevant question is not whether counsel's choices were strategic, but whether they were reasonable." Roe, 528 U.S. at 480 (citing Strickland, 466 U.S. at 688); see Chandler v. United States, 218 F.3d. 1305, 1315-16 (11th Cir. 2000) (en banc) (explaining how ultimate inquiry under Strickland's first prong is whether counsel's performance was objectively reasonable), cert. denied, 531 U.S. 1204 (2001).

Consequently, even where an attorney pursued a particular course of action for strategic reasons, courts still consider whether that course of action was

objectively reasonable, notwithstanding <u>Strickland</u>'s strong presumption in favor of upholding strategic decisions.  <u>See</u> <u>Fisher</u>, 282 F.3d at 1296 (explaining that "'the mere incantation of "strategy" does not insulate attorney behavior from review'" (quoting <u>Brecheen</u>, 41 F.3d at 1369 (further citation omitted))); <u>Phoenix v. Matesanz</u>, 233 F.3d 77, 82 n.2 (1st Cir. 2000) ("We should note that '*virtually* unchallengeable' does differ from 'unchallengeable.'  Our overall task according to <u>Strickland</u> is to determine whether the challenged 'acts or omissions [are] outside the wide range of professionally competent assistance.'" (quoting <u>Strickland</u>, 466 U.S. at 690));  <u>Washington v. Hofbauer</u>, 228 F.3d 689, 703-04 (6th Cir. 2000) (explaining that even if a court concludes that counsel chose not to cross-examine a witness for strategic reasons, the court "cannot stop there, [but] . . . must also assess if this strategy was constitutionally deficient").

By the same token, an attorney's unawareness of relevant law at the time he made the challenged decision does not, in and of itself, render the attorney's performance constitutionally deficient.  When discussing <u>Strickland</u>'s deficient performance component, for example, we have emphasized that "[t]he Sixth Amendment does not guarantee an errorless trial, and 'prevailing professional norms' do not require perfection at trial."  <u>Haddock</u>, 12 F.3d at 956 (citing <u>Denton</u>, 791 F.2d at 828).  <u>Cf.</u> <u>Long v. McKeen</u>, 722 F.2d 286, 289 (6th Cir. 1983) ("[T]he Constitution guarantees only a fair trial and competent attorney.  It

does not mandate that trial counsel will recognize and raise every conceivable constitutional claim. This is true whether the failure to raise the constitutional claim is based upon ignorance of the law or a mistake in judgment . . . ." (internal quotation and citation omitted)). Similarly, the Supreme Court has cautioned federal courts that even in circumstances where an attorney erred, "[i]t will generally be appropriate for a reviewing court to assess counsel's overall performance throughout the case in order to determine whether the 'identified acts or omissions' overcome the presumption that counsel rendered reasonable professional assistance." Kimmelman, 477 U.S. at 386, a position echoed in our decision in United States v. Smith, 10 F.3d 724 (10th Cir. 1993) (per curiam).

In Smith, we found an attorney's representation "objectively reasonable," even though the attorney failed to request a lesser-included-offense jury instruction and was "unaware of the availability of the lesser included offense [instruction] and thus necessarily ignorant of the consequences of his conduct." Id. at 728. We justified this conclusion on "Strickland's focus on objectively reasonable representation considering all circumstances" and reasoned that "counsel's representation as a whole should be considered when determining whether the defendant received a fair trial."[6] Id. As we explained:

---

[6]    Smith acknowledged that, "at first blush," certain language in Strickland could be construed as holding that an attorney's conduct is objectively

(continued...)

- 21 -

> We are satisfied that even if Defense Counsel had been aware of the availability of the lesser included offense [instruction] . . ., Counsel's actual representation would still have been within the range of objectively reasonable representation. Consequently, we are of the view that where counsel's representation is objectively reasonable under all the circumstances of a case and ensured that the defendant received a fair trial overall, it makes no difference that certain decisions may have been unreasonable or made without a full recognition of the consequences.

Id. at 729; see also Chandler, 218 F.3d at 1315-16 & nn. 16-17 (explaining that to satisfy Strickland's deficient performance prong, "a petitioner must establish that no competent counsel would have taken the action that his counsel did take," and that deficiency will not be found where fully informed and competent "hypothetical counsel" could have taken the same action) (emphasis added); Harich v. Dugger, 844 F.2d 1464, 1470-71 (11th Cir. 1988) (en banc) (holding that attorney's ignorance of potential defense under state law did not establish deficient performance under Strickland because fully competent attorney aware of

---

[6](...continued)
unreasonable where the attorney was "unaware" of the availability of a lesser-included-offense instruction. Smith, 10 F.3d at 728. The court specifically referenced language in Strickland discussing an attorney's duty to investigate: "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes a particular investigations unnecessary." Strickland, 466 U.S. at 690-91. Ultimately, however, we concluded in Smith that "Strickland's focus on objectively reasonable representation considering all circumstances" meant that an uninformed decision could still be objectively reasonable. 10 F.3d at 728.

the defense "could well have taken action identical to counsel in this case"),

partial overruling on other grounds by Romano v. Oklahoma, 512 U.S. 1 (1994),

recognized in Davis v. Singletary, 119 F.3d 1471, 1482 (11th Cir. 1997). Cf.

Dixon v. Snyder, 266 F.3d 693, 703 (7th Cir. 2001) (finding that if counsel had

been aware of relevant state law, his actions would been "even more

unreasonable").

Certainly, an attorney's ignorance will affect a court's ineffective

assistance of counsel analysis. An attorney's demonstrated ignorance of law

directly relevant to a decision will eliminate Strickland's presumption that the

decision was objectively reasonable because it might have been made for strategic

purposes, and it will often prevent the government from claiming that the attorney

made an adequately informed strategic choice.[7] See, e.g., Williams v. Taylor, 529

_____

[7] Analogously, we have often held that an attorney's failure to present a defense theory or mitigation evidence cannot be considered strategic where that decision was influenced by inadequate preparation and investigation. Fisher, 282 F.3d at 1296 (concluding that counsel's "accidental[] elicitat[ion] [of] damaging testimony" during a capital murder trial could not be considered strategic where the attorney did not "undertake substantial pretrial investigation," and where the testimony was "produced by the happenstance of counsel's uninformed and reckless cross-examination"); Battenfield v. Gibson, 236 F.3d 1215, 1229 (10th Cir. 2001) (explaining that an attorney's failure to investigate potential mitigation evidence could not be dismissed as strategic where the attorney "was ignorant of various other mitigation strategies he could have employed"). Nothing in our decision should be construed as affecting an attorney's obligation to investigate particular defenses or seek out mitigation evidence. See, e.g., Stouffer v. Reynolds, 168 F.3d 1155, 1167 (10th Cir. 1999);

(continued...)

U.S. 362, 395 (2000) (observing that attorney's failure "to conduct an investigation that would have uncovered extensive records graphically describing [the defendant's] nightmarish childhood" could not be considered strategic where counsel "incorrectly thought that state law barred access to such records"); Dixon, 266 F.3d at 703 (holding that where counsel was unaware of a state statute governing cross-examination, "his decision not to cross-examine [the witness] cannot be accorded the same presumption of reasonableness as is accorded most strategic decisions"); Pavel v. Hollins, 261 F.3d 210, 218 n. 11 (2d Cir. 2001) (collecting cases and discussing how decisions made in ignorance of relevant facts and law cannot be characterized as strategic under Strickland); see also Bryan v. Gibson, 276 F.3d 1163, 1183 (10th Cir. 2001) (reh'g en banc granted, April 26, 2002) (Henry, J., concurring part and dissenting in part) (arguing that counsel's decision not to present certain mitigation evidence could not be considered strategic because the defense attorney "did not even realize that he could present" the evidence at issue) (emphasis omitted).

In many cases, a lawyer's unawareness of relevant law will also result in a finding that counsel performed in an objectively deficient manner. See, e.g., Kimmelman, 477 U.S. at 385-86 (explaining that counsel's failure to conduct

---

[7](...continued)
Breechen, 41 F.3d at 1366.

pretrial discovery was objectively unreasonable because counsel had a "startling ignorance of the law" and mistakenly believed "that the State was obliged to take the initiative and turn over all of its inculpatory evidence to the defense and that the victim's preferences would determine whether the State proceeded to trial after an indictment had been returned"); Magana v. Hofbauer, 263 F.3d 542, 550 (6th Cir. 2001) ("[Counsel's] complete ignorance of the relevant law under which his client was charged, and his consequent gross misadvice to his client regarding the client's potential prison sentence, certainly fell below an objective standard of reasonableness under prevailing professional norms."); Baker v. Barbo, 177 F.3d 149, 154 (3d Cir. 1999) (holding that "a trial attorney's error with respect to his ignorance of the sentencing law [at issue in the case] has satisfied the first prong of the Strickland test"); United States v. Glover, 97 F.3d 1345, 1349 (10th Cir. 1996) ("The illegal-sentence issue counsel failed to raise was clearly meritorious under the existing [United States Sentencing] [G]uidelines and elementary burden-of-proof principles, surely both matters within the requisite expertise of a practicing member of the criminal defense bar."); United States v. Kissick, 69 F.3d 1048, 1056 (10th Cir. 1995) ("An attorney's failure to challenge the use of a prior conviction to classify the defendant as a career offender when that prior conviction is facially insufficient to satisfy the definition of a 'controlled substance offense' under USSG § 4B1.2 therefore constitutes deficient

performance under Strickland."); see also LaFave et al., Criminal Procedure § 11.10(c) at 720 (explaining that "clearly negligent treatment of a crucial deficiency in the prosecution's case or an obvious strength of the defense" will render an attorney's overall performance inadequate).

Even where an attorney's ignorance of relevant law and facts precludes a court from characterizing certain actions as strategic (and therefore presumptively reasonable), however, the pertinent question under the first prong of Strickland remains whether, after considering all the circumstances of the case, the attorney's representation was objectively unreasonable. See Roe, 528 U.S. at 481; Kimmelman, 477 U.S. at 386; Strickland, 466 U.S. at 688-90; Chandler, 218 F.3d at 1315-16 & n.16; Smith, 10 F.3d at 729; Harich, 844 F.3d at 1470-71; see also Pavel, 261 F.3d at 219-23 (concluding that trial counsel's decision not to call a witness could not be considered strategic but then considering whether attorney's performance was unreasonable). If the performance was objectively reasonable, then the ineffective assistance claims fails. See Strickland, 466 U.S. at 697.

In summary, whether a counsel's actions can be considered strategic plays an important role in our analysis of Strickland's deficient performance prong. As a general matter, we presume that an attorney performed in an objectively reasonable manner because his conduct might be considered part of a sound strategy. Moreover, where it is shown that a challenged action was, in fact, an

adequately informed strategic choice, we heighten our presumption of objective reasonableness and presume that the attorney's decision is nearly unchallengeable. The inapplicability of these presumptions (because, for example, the attorney was ignorant of highly relevant law) does not, however, automatically mean that an attorney's performance was constitutionally inadequate. Instead, we still ask whether, in light of all the circumstances, the attorney performed in an objectively reasonable manner.

### D. Ineffective Assistance of Counsel Claim

With these principles in mind, we consider the specifics of Mr. Bullock's ineffective assistance of counsel claim.

### 1. Children's Direct Testimony

As outlined earlier, the district court found that Mr. Bullock's trial attorneys premised much of their trial strategy on the belief that the children's direct testimony, whether live in the courtroom or, as occurred in this case, through videotape, could not be excluded, and, as presented, would be credible.

On appeal, Mr. Bullock argues, as he did before the district court, that his attorneys performed ineffectively because the children's direct testimony could have been excluded using Utah Rule of Evidence 403, which, like its federal counterpart, provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of

the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Utah R. Evid. 403; see Fed. R. Evid. 403. The magistrate judge and the district court both found this argument to be without merit, and we agree with this conclusion.

As Mr. Bullock acknowledges, Utah law existing at the time of his trial deemed the boys legally competent to testify about the alleged abuse: "A child victim of sexual abuse under the age of ten is a competent witness and shall be allowed to testify without prior qualification in any judicial proceeding. The trier of fact shall determine the weight and credibility of the testimony." Utah Code Ann. § 76-5-410. Nonetheless, Mr. Bullock argues that his trial counsel should have invoked Rule 403, which also existed at the time of his trial, and, citing Dr. Snow's coercive tactics, moved to exclude the children's testimony as inherently unreliable.

In making this argument, Mr. Bullock relies upon a decision handed down by the Utah Supreme Court five months after his trial, State v. Fulton, 742 P.2d 1208 (Utah 1987). In Fulton, the supreme court explained that "the law in Utah is that all witnesses are competent, and section 76-5-410 is not an exception to this general rule. Every person is considered competent to be a witness and must be allowed to testify unless the testimony is otherwise excludable under the Utah Rules of Evidence." Id. at 1217. The court cautioned, however, that section 76-

5-410 "does not mean that the trial court may never prevent a child from testifying." Id. at 1218. Instead, explained the court, a trial judge might exclude a child's testimony under Rule 403, if it were to find the testimony "unreliable." Id. In a footnote, the supreme court observed that a trial court "may take into account the child's susceptibility to suggestion and whether the child has been intentionally prepared or unconsciously influenced by adults in such a way that it is likely the child is only parroting what others have said about the relevant facts." Id. at 1218 n.15.

We find Mr. Bullock's invocation of Fulton unconvincing. When reviewing an ineffective assistance of counsel claim, we must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. Consequently, we have rejected ineffective assistance claims where a defendant "faults his former counsel not for failing to find existing law, but for failing to predict future law" and have warned "that clairvoyance is not a required attribute of effective representation." United States v. Gonzalez-Lerma, 71 F.3d 1537, 1542 (10th Cir. 1995); Sherrill v. Hargett, 184 F.3d 1172, 1175 (10th Cir. 1999) ("Generally, counsel is not ineffective for failing to anticipate arguments or appellate issues that only blossomed after defendant's trial and appeal have concluded."); see also

Smith v. Singletary, 170 F.3d 1051, 1054-55 (11th Cir. 1999); Lilly v. Gilmore, 988 F.2d 783, 786-88 (7th Cir. 1993) (both explaining that trial counsel is not ineffective just because he offered legal advice later found erroneous, provided the underlying legal advice was objectively reasonable at the time it was given).

In this case, the failure to invoke Rule 403 at the time of Mr. Bullock's trial was not objectively unreasonable. Section 76-5-410 states unequivocally that children under the age of ten "shall be allowed to testify without prior qualification in any judicial proceeding." Utah Code Ann. § 76-5-410. Prior to the Fulton decision, the provision could have been read as mandating that any credibility questions, which arguably would include the "reliability" of the children's testimony, be resolved by the jury: "The trier of fact shall determine the weight and credibility of the testimony." Id. In any event, Fulton does not unequivocally support Mr. Bullock's argument. While the Utah Supreme Court noted that the Rule 403 could be used to exclude inherently unreliable testimony, Fulton itself found that the admission of the child's testimony did not violate Rule 403. Fulton, 742 P.2d at 1218. Moreover, Fulton only held that a trial court "may take into account" the unreliability of the children's testimony in applying Rule 403, and "should consider" this factor along with any others "that have a bearing on the balancing required by Rule 403." Id. at 1218 n.15 (emphasis added). The decision, as we understand it, gave Utah trial courts the right to

consider the reliability of children's testimony when deciding whether such testimony should be admitted into evidence, but it did not require the per se exclusion of unreliable testimony. Therefore, even if Mr. Bullock's counsel had invoked Rule 403 and challenged the reliability of the children's testimony, the trial court could have exercised its discretion and admitted the evidence, a decision that the Utah appellate courts could only have reviewed for an abuse of discretion.

Because we do not believe that Mr. Bullock's attorneys performed deficiently by not invoking Rule 403, we reject Mr. Bullock's argument that his trial counsel acted ineffectively by not challenging the boys' direct testimony under Rule 403.

### 2. Children's Hearsay Testimony

Utah law–both as it exists now and as it existed at the time of Mr. Bullock's trial–permits the admission of "a child victim's out-of-court statement regarding sexual abuse of that child" in certain circumstances. Utah Code Ann. § 76-5-411(1). Before admitting any hearsay statement, however, the statute requires that "the judge shall determine whether the interest of justice will best be served by admission of that statement." Id. § 76-5-411(2) (emphasis added). When deciding whether to admit the hearsay testimony, the statute declares that the "judge shall consider the age and maturity of the child, the

nature and duration of the abuse, the relationship of the child to the offender, and the reliability of the assertion and of the child." Id. (emphasis added).

Importantly, a year before Mr. Bullock's trial, the Utah Supreme Court made clear that state trial courts must assess the reliability of a child's hearsay statement prior to admitting it into evidence. See State v. Nelson, 725 P.2d 1353, 1355 n.3 (Utah 1986) (explaining that the importance of finding the child's hearsay statement reliable "cannot be overemphasized" and warning that "the trial court must make an in-depth evaluation of the proposed testimony" before it can be admitted). Indeed, the court identified factors beyond those mentioned in the statute that a court should consider when assessing the reliability of hearsay statements, noting that "to determine the reliability of the statement, a court should consider how soon after the event it was given, whether the statement was spontaneous, the questions asked to elicit it, the number of times the statement was repeated or rehearsed, and whether the statement is repeated verbatim in court, viz., tape recording, video, or otherwise." Id.

Based on our review of the state trial proceedings, it appears, as Mr. Bullock contends, that at least one of his attorneys, Steven McCaughey, did not fully grasp section 76-5-411's reliability component and erroneously believed that the children's hearsay statements to Drs. Snow and Tyler would be admitted

under any circumstances.[8]  Mr. Bullock's other attorney, Christine Soltis, seemed to acknowledge that in theory the hearsay statements could have been excluded for reliability grounds under section 76-5-411, but explained that she doubted that would occur in practice.

We conclude, however, that a fully informed attorney could have concluded that admitting the hearsay statement was to Mr. Bullock's strategic advantage and, therefore, that his attorneys' performance was not objectively unreasonable. See Smith, 10 F.3d at 729; Harich, 844 F.2d at 1470-71.  For example, as Mr. McCaughey pointed out during the evidentiary hearing, if the hearsay statements had been excluded, then the only testimony presented by the prosecution would have been the direct testimony of the children, and it is objectively reasonable to conclude, as Mr. Bullock's attorneys in fact concluded, that directly attacking the children on cross-examination would not have been an effective trial strategy to produce an acquittal.  Further, it is undisputed that by admitting the hearsay statements, Mr. Bullock's trial counsel was able to (1)

---

[8]    During pretrial proceedings, the prosecuting attorney discussed Nelson and recommended that a hearing be held to establish the reliability of the hearsay statements.  The trial court declined to hold such a hearing, but warned the county attorney that before the hearsay testimony could be admitted, it would have to make findings in accordance with section 76-5-411.  Mr. Bullock's trial counsel did not respond, and when the hearsay testimony was offered during the ensuing trial, they did not attempt to block it under section 76-5-411, despite Dr. Snows's disconcerting actions.

- 33 -

highlight inconsistencies and contradictions in the children's testimony, (2) expose Dr. Snow's unprofessional interview tactics, (3) reveal ways in which the children may have "contaminated" one another, and (4) generally argue that the children's allegations resulted from Dr. Snow's pressure tactics.

In light of these considerations, we reject the hearsay component of Mr. Bullock's ineffective assistance of counsel claim. Having rejected both components of Mr. Bullock's ineffective assistance of counsel argument under the first prong of <u>Strickland</u>, we reject his ineffective assistance of counsel claim in its entirety. <u>Strickland</u>, 466 U.S. at 697.

## IV. <u>Due Process Clause and Confrontation Clause Claims</u>

Beyond his ineffective assistance of counsel arguments, Mr. Bullock raises two additional claims on appeal. First, he alleges that he was "denied federal due process of law when the police permitted Barbara Snow to initially interview the children since she was not a neutral-fact gatherer," did not record her interviews, and used coercive interviewing tactics that "contaminated" and "shaped" the children's testimony. Second, he alleges that the children's videotaped testimony violated his rights under the Confrontation Clause. Mr. Bullock does not cite a single case in his brief to support either argument, and his brief devotes a total of five of its eighty-plus pages to the two arguments. Instead, Mr. Bullock argues

that the "space limitation in this appeal" does not allow him to address the issues in detail and directs us to an addendum containing his filings before the district court.

After receiving Mr. Bullock's opening brief, Utah moved to strike Mr. Bullock's Due Process Clause and Confrontation Clause arguments on the ground that the legal authority to support them is incorporated in his appellate brief by reference to the briefs he filed in the federal district court. Normally, we will not consider arguments on appeal that simply direct us to filings before the district court. See Gaines-Tabb v. ICI Explosives USA, Inc., 160 F.3d 613, 623-24 (10th Cir. 1998) (explaining that allowing parties to simply adopt on appeal the pleading filed in district court "rather than setting forth in their appellate brief their quarrel with the district court's reasoning" would create a "means of circumventing the page limitations on briefs set forth in the appellate rules and unnecessarily complicate the task of an appellate judge") (citations omitted). In this case, however, Mr. Bullock's opening appellate brief contains a short statement of the issues and arguments related to his Due Process and Confrontation Clause claims, and Utah has responded to those arguments in its brief. Therefore, we will consider those claims as framed in the opening brief. Utah's motion to strike the arguments is denied.

A. <u>Due Process</u>

Mr. Bullock's due process argument has two components, as best we can tell. First, he contends that the state violated his due process rights by allowing Dr. Snow to ply her questionable interview techniques on the children. Second, in a related argument, he contends Dr. Snow's failure to record her interviews amounts to state action that failed to preserve potentially exculpatory evidence. We reject both arguments.

1. <u>Unreliability</u>

In advancing his "unreliability" argument, Mr. Bullock argues that his conviction depended upon the testimony (either direct or hearsay) of children who had been subjected to Dr. Snow's coercive interview tactics. As a factual and legal matter, he asserts, Dr. Snow's techniques rendered the boys' testimony inherently unreliable. Because the evidence was not reliable, he further argues, it should not have been admitted during his trial, and because his conviction depended upon this improperly admitted unreliable evidence, he contends, his conviction violates due process.

A habeas petitioner is only entitled to relief, however, for alleged violations of federal rights, not for errors of state law. See <u>Estelle v. McGuire</u>, 502 U.S. 62, 67 (1991). Generally speaking, a state court's misapplication of its own evidentiary rules–which seems to be at the heart of Mr. Bullock's unreliability

claim–is insufficient to grant habeas relief.  Id. at 72 ("Nor do our habeas powers allow us to reverse [a petitioner's] conviction based on a belief that the trial judge incorrectly interpreted the California Evidence Code in ruling that the prior injury evidence was admissible as bad acts evidence in this case.").  Under Tenth Circuit precedent, Mr. Bullock may only obtain habeas relief for an improper state evidentiary ruling "if the alleged error was 'so grossly prejudicial [that it] fatally infected the trial and denied the fundamental fairness that is the essence of due process.'"  Revilla v. Gibson, 283 F.3d 1203, 1212 (10th Cir. 2002) (quoting Fox, 200 F.3d at 1296) (bracket in original); see also Chambers v. Mississippi, 410 U.S. 284, 289-90, 302 (1973) (holding that Mississippi's application of its rules of evidence denied a petitioner a fair trial).  While it is undisputed that "[t]he right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment," Estelle v. Williams, 425 U.S. 501, 503 (1976), the Supreme Court has defined "the category of infractions that violate fundamental fairness very narrowly.  Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."  Estelle, 502 U.S. at 73 (internal quotations and citations omitted).

In this case, Snow's improper interviewing techniques were fully identified, examined, criticized, and interpreted at a trial in which Mr. Bullock was represented by competent counsel.    It is clear from the trial record, for instance,

that Mr. Bullock's trial counsel attacked Dr. Snow's credibility throughout the trial, raised the argument that Dr. Snow implanted the allegations of abuse in the boys' minds, and elicited expert testimony–including the state's own expert–condemning Dr. Snow's interview techniques.  Cf. Chambers, 410 U.S. at 302 (finding Due Process violation where state evidentiary ruling prevented the petitioner from asserting his defense).  Under the circumstances, we decline to hold that Mr. Bullock's trial was fundamentally unfair.

## 2.  Failure to Record Interviews

The second aspect of Mr. Bullock's due process claim revolves around Dr. Snow's failure to record her interviews with the children.  According to Mr. Bullock:

> Snow intentionally failed to preserve critical evidence of her initial and subsequent interviews in spite of the fact that she knew such interviews were critically important to both the prosecution and the defense in ascertaining the truth of the allegations she ascribed to the children.  In addition, such failure was accomplished in complete bad faith since she had been requested numerous times to do so by the police and by other therapists.  Finally, the loss of a record of these initial priceless interviews can never be replaced for Appellant's defense.

This argument is unavailing.

The Due Process Clause requires police departments to preserve clearly exculpatory evidence in their possession that might not be available to a defendant through other means.  California v. Trombetta, 467 U.S. 479, 489

(1984); United States v. Gomez, 191 F.3d 1214, 1218 (10th Cir. 1999). A defendant can obtain relief under the Due Process Clause when he can show that a police department destroyed evidence with "an exculpatory value that was apparent before [it] was destroyed." Trombetta, 467 U.S. at 489; Gomez, 191 F.3d at 1218. Where, however, the police only failed to preserve "potentially useful" evidence that might have been exculpatory, a defendant must prove that the police acted in bad faith by destroying the evidence. Arizona v. Youngblood, 488 U.S. 51, 58 (1988) ("[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."); Gomez, 191 F.3d at 1219 ("In order to establish a due process violation with respect to 'potentially useful' evidence, [a defendant] must show that the government acted in bad faith in destroying it.").

Turning to the facts of this appeal, it is important to note that because Mr. Bullock can only speculate about the potentially exculpatory nature of the interviews, he must satisfy Youngblood's bad faith requirement, assuming for this appeal that the failure to record an interview is governed by Youngblood.[9]

_____

[9]    If Dr. Snow had kept notes or otherwise recorded her interviews, then those records would fall clearly within the Youngblood parameters (assuming for the moment that Dr. Snow was a police agent). See Morgan v. Gertz, 166 F.3d 1307, 1309-10 (10th Cir. 1999) (applying Youngblood where police officers destroyed a tape recording of an interview); United States v. Femia, 9 F.3d 990, 995 (1st Cir. 1993) (applying Trombetta and Youngblood where the police failed to properly
(continued...)

Youngblood, 488 U.S. at 58; Gomez, 191 F.3d at 1219. Yet even if Dr. Snow

acted in bad faith,[10] Mr. Bullock's argument falters, for Dr. Snow cannot be

described as either a police officer or as an agent of the police. It is true that

Dr. Snow's revelations triggered the police investigation into this case and that

much of the information relied upon by the prosecution originated from

Dr. Snow's interviews. At the time Dr. Snow conducted the interviews at issue,

however, she worked at ISAT. Although the "bulk" of ISAT's finances came

from a treatment contract it had with Utah's Division of Family Services, ISAT

was privately run and depended upon funding sources besides the state contract,

including grants, private donations, fees it charged clients, and insurance

coverage. Moreover, ISAT developed and implemented its own practices and

procedures without, as best we can tell from the record on appeal, direction from

the state or the police.

---

[9](...continued)
preserve tape recordings). It is not at all clear, however, that Youngblood applies where a police officer fails to take notes or record an interview in the first instance. See United States v. Brimage, 115 F.3d 73, 76 (1st Cir. 1997) ("The government is surely correct that the decision not to record a conversation is categorically different from the failure by police to maintain the breath samples of a drunk driving defendant, as was the case in Trombetta, or the failure to preserve semen samples in a sexual assault case, as happened in Youngblood."). For purposes of this appeal only, we assume, without deciding, that the a police officer's failure to record an interview could be governed by Youngblood.

[10]     Dr. Snow defended her failure to document the interviews on the ground that recording equipment inhibits children "from bring[ing] out new information."

Nor does it appear that the police condoned Dr. Snow's dubious interview techniques. Indeed, detectives specifically requested that Dr. Snow record her interviews, and eventually the police and the prosecutor's office intervened and ended Dr. Snow's interviews.[11] At most, then, Mr. Bullock could argue that the police acted negligently in not stopping the unrecorded interviews earlier, but negligence is an insufficient basis for establishing bad faith under Youngblood. United States v. Bohl, 25 F.3d 904, 912 (10th Cir. 1994) ("Of course, mere negligence on the government's part in failing to preserve such evidence is inadequate for a showing of bad faith.").

Consequently, we reject the second component of Mr. Bullock's due process claim.

---

[11] Under section 1983, "[p]rivate persons, jointly engaged with state officials in the challenged action," are considered stated actors acting under color of state law. Dennis v. Sparks, 449 U.S. 24, 27-28 (1980) (White, J.). However, the premise of this liability is that a state officer or official has taken some affirmative action or step to deprive the section 1983 plaintiff of a constitutional right. See id. at 28-29 (explaining how private parties "conspire with" state officials). In the present case, we can find no evidence suggesting that the police or the prosecutor conspired to prevent Dr. Snow from recording the interviews. In fact, as discussed above, the record suggests that the police encouraged Dr. Snow to record her interviews and eventually discouraged the children from meeting with her again.

## B. Confrontation Clause

Mr. Bullock's Confrontation Clause argument is summarized in his opening brief. Like his Due Process Claim, Mr. Bullock's Confrontation Clause argument raises two subsidiary issues. First, he alleges that the trial court failed to make statutorily and constitutionally required findings of unavailability and reliability before permitting the children to testify via videotape. Second, and more generally, he contends that his rights under the Confrontation Clause were violated when the trial court admitted the children's hearsay statements without fulfilling its "independent duty to evaluate the reliability of the hearsay testimony and to make a record of evaluation."

To the extent Mr. Bullock's Confrontation Clause argument relies on state law, they must fail.[12] Estelle, 502 U.S. at 67-68. Moreover, we have previously explained that a defendant waives the protections guaranteed by the Clause when his counsel, for reasonable strategic or tactical reasons "stipulat[es] to the admission of hearsay evidence" or elects not to cross-examine a witness. Hawkins v. Hannigan, 185 F.3d 1146, 1154-55 & n.5 (10th Cir. 1999).[13] As

_____

[12] As explained earlier, we cannot grant Mr. Bullock relief to the extent that his habeas claims are premised on alleged violations of Utah's evidentiary rules. See Moore, 254 F.3d at 1246 (citing Estelle, 502 U.S. at 67-68).

[13] Although Hawkins dealt with a situation where an attorney affirmatively stipulated in his client's presence to the admission of hearsay testimony, the opinion indicated that an attorney could waive Confrontation Clause rights

(continued...)

discussed earlier, trial counsel appeared to have an objectively reasonable strategy for admitting the children's hearsay testimony, namely to attack Dr. Snow's credibility and to reveal inconsistencies in the boys' stories. Therefore, because Mr. Bullock's ineffective assistance of counsel claims fail, his Confrontation Clause argument also fails.

## V. Conclusion

The quest for the truth in sexual abuse cases is always difficult, particularly when the prosecution's case heavily relies upon the testimony of young victims. In this case, Dr. Snow's disturbing and irresponsible conduct has made this quest especially difficult. We do not know whether Dr. Snow still counsels children or testifies as a prosecution witness in sexual abuse cases; if she does either, we hope that she now follows proper professional and ethical standards. See, e.g., State v. Hadfield, 788 P.2d 506, 508-09 (Utah 1990) (explaining pervasive criticism of Dr. Snow's interview techniques and how "one police officer . . . described how the children in Dr. Snow's care were able to reproduce specific

---

[13](...continued)
through more implicit actions, such as failing to object or not cross-examine a witness. 185 F.3d at 1155 n.5 (explaining that an attorney's decision "to forego" or "to limit" cross examination of a witness can also be "an effective waiver of the defendant . . . if done pursuant to a reasonable trial strategy in defendant's presence, and without defendant's objection thereto, without requiring proof of defendant's knowing and express consent").

information after he had suggested to Dr. Snow that such information should be present in their statements").

However, after carefully reviewing the record on appeal and considering Mr. Bullock's legal arguments, we conclude that he is not entitled to federal habeas relief. We therefore **GRANT** a COA on the issues raised by Mr. Bullock and **AFFIRM** the district court's denial of relief.