**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 29, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

KRIS SMITH,

Defendant - Appellant.

No. 10-1117
(D.C. Nos. 1:08-CV-01721-WDM and
1:05-CR-00502-WDM-1)
(D. Colorado)

---

**ORDER AND JUDGMENT**[*]

---

Before **MURPHY**, **TYMKOVICH**, and **GORSUCH**, Circuit Judges.

---

I.     **Introduction**

Following a five-day trial, defendant-appellant Kris A. Smith was found

guilty of three counts of willfully making false statements on federal income tax

returns, in violation of 26 U.S.C. § 7206(1), and one count of willfully failing to

file a federal income tax return, in violation of 26 U.S.C. § 7203.  Smith

subsequently identified a number of alleged deficiencies in the performance of her

trial counsel, Gregory Mueller, and moved to vacate, set aside or correct her

---

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

sentence pursuant to 28 U.S.C. § 2255. She also filed a separate motion requesting an evidentiary hearing in the event the district court found the record insufficient to support her requested relief. In a thorough order, the district court denied the § 2255 motion and, in so doing, effectively denied the hearing request sub silentio. The district court then granted Smith's subsequent application for a certificate of appealability ("COA") on the merits of her habeas claim, but denied a COA on the issue of the evidentiary hearing. *See* 28 U.S.C. § 2253(c) (providing no appeal may be taken from a "final order in a proceeding under section 2255" unless the movant first obtains a COA). Smith now appeals the denial of her § 2255 motion and presents argument on the question whether she was entitled to an evidentiary hearing, which we treat as an application to this court for a COA.

Even assuming Mueller's performance at trial fell below the objective standard of reasonableness required under *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the evidence adduced against Smith was so overwhelming that these alleged deficiencies caused her no prejudice. Exercising jurisdiction under 28 U.S.C. §§ 2255(d) and 2253(a), we therefore **AFFIRM** the district court's decision denying Smith's § 2255 motion. Furthermore, because Smith has not "made a substantial showing" that the district court's refusal to grant an

evidentiary hearing resulted in "the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the court **DENIES** her request for a COA.

## II.    Background

Smith was a Colorado business owner with over twenty years of experience as a bookkeeper and tax preparer.  In the late 1990's, one of her businesses was acquired through merger, and she received a sizable amount of stock as compensation.  Between 1997 and 1998, Smith sold $188,108 worth of this stock, incurring significant capital gains taxes.  She liquidated the remainder of this stock in 1999, generating proceeds of $410,479.

Unhappy with the large tax burden she expected to incur from her stock sales, Smith became involved with Anderson's Ark and Associates ("AAA"), an organization that purported to offer financial planning strategies designed to reduce or eliminate its clients' tax liabilities.  After being introduced to AAA and paying several thousand dollars in fees, Smith availed herself of the organization's so-called "Look Back Program."   The Look Back Program involved creating business partnership losses, which could be used to offset current taxable income and reduce the client's tax liability in surrounding years.

The Look Back losses were generated as follows:  First, AAA planners prepared documents purporting to form a partnership between Smith and Macro Media Advertising LLC ("Macro Media"), a AAA-controlled entity.  Smith held a

95% interest in the partnership, which was known as "Rocky Ventures." Rocky Ventures was then made to incur a $1,000,000 payment obligation to its 5% partner, Macro Media. In exchange, Macro Media agreed to market certain tax reduction programs and a 1-900 tax advice phone number. The proceeds from Macro Media's marketing efforts would then be returned to Rocky Ventures, recouping the $1,000,000 payment and, ultimately, resulting in profit for the partnership. Pursuant to a separate agreement, Macro Media contracted to repay the bank loan itself in the event that its marketing efforts generated insufficient profits. Rocky Ventures ostensibly obtained the $1,000,000 for this payment through a loan issued by La Maquina Blanca, S.A., a AAA-controlled entity purporting to be a Costa Rican bank. The bank demanded no collateral for this loan, but AAA charged Smith an $87,000 "loan origination fee," of which she ultimately paid $50,000.

Through this arrangement, Rocky Ventures recognized the $1,000,000 payment as a tax loss for fiscal year 1999. The tax loss then "flowed through" to Rocky Venture's owner, Smith, in proportion to her interest in the partnership (95%), and was sufficient to completely eliminate Smith's tax liability for 1999 despite the $394,830 in capital gains she recognized from the sale of stock. Smith's losses were in fact so large that her net taxable income for 1999 was reported to be *negative* $460,547. Pursuant to the Internal Revenue Code

provisions in effect at the time, Smith's net loss for 1999 could be carried back and used to offset income for the two preceding tax years. Accordingly, Smith filed an amended return, seeking a refund for federal income taxes paid in 1997 and 1998; she later received refunds of $50,284 for 1997 and of $21,149 for 1998. Finally, Smith carried her 1999 net loss *forward* to 2000, completely offsetting her income for that tax year as well.

In addition to her use of the Look Back Program, Smith participated in AAA's "Loan 4" program. Under Loan 4, AAA clients could supposedly fund short-term loans to Costa Rican businesses in a "factoring" investment program. The loans promised high returns (4% growth every six weeks). Smith ultimately invested over $200,000 in the Loan 4 program.

Apparently pleased with the results of AAA's products and strategies, Smith sought to increase her involvement with the organization. After successfully completing a written examination, she became an "Information Officer" for AAA. In this capacity, Smith introduced others to AAA's programs and presented at AAA-sponsored events, receiving commissions from AAA in exchange.

The astonishingly effective tax avoidance opportunities offered by AAA were, of course, too good to be true. AAA's business strategies and investment programs were largely fraudulent and illegal, resulting in millions of dollars in

losses to both the United States government and AAA clients. In the Look Back Program, for example, La Maquina Blanca never actually provided any loan proceeds to Macro Media, and Macro Media never engaged in any marketing of tax reduction products. Consequently, the partnership losses created by the Look Back Program were not cognizable for tax purposes. The 5-7% "loan origination fees" charged by AAA for these fictitious loans were, moreover, either appropriated by AAA's principals or cycled back into the scheme. Similarly, the money paid into Loan 4 by AAA clients was never invested into a "factoring" program, but was instead converted for AAA's principals' personal use or co-mingled with general AAA funds.

The founders and principals of AAA were charged with a variety of conspiracy, fraud and criminal tax violations (the "*Anderson* prosecution"). Key figures charged in the *Anderson* prosecution included Keith Anderson, founder of AAA; Richard Marks, AAA's lead accountant and planner; and Jim and Pamela Moran, AAA "Executive Education Officers" and Smith's primary point of contact with the organization. After trial in the United States District Court for the Western District of Washington, the *Anderson* defendants were found guilty of all charges.[1] Smith was listed as a victim of AAA's Loan 4 scheme in the

---

[1] The convictions of Marks and Anderson were largely upheld on appeal. *See United States v. Marks*, 530 F.3d 799 (9th Cir. 2008); *United States v. Anderson*, 472 F.3d 662 (9th Cir. 2006). The convictions of Jim and Pamela

(continued...)

*Anderson* prosecution, and the Government obtained a judgment ordering Keith

Anderson to pay $250,000 restitution for her losses.

Although Smith was described as a victim of the Loan 4 scheme in the

*Anderson* prosecution, the government concluded Smith had perceived the sham

nature of the deductions she claimed through the Look Back Program.

Accordingly, Smith was charged with three counts of willfully making false

statements on federal income tax forms in violation of 26 U.S.C. § 7206(1). The

underlying bases for the charges were her tax returns for years 1999 and 2000,

and her request for refunds from 1997 and 1998. A fourth count charged her with

willfully failing to file a 2003 federal income tax return on behalf of Neco &

Associates, a partnership founded by Smith, in violation of 26 U.S.C. § 7203.

Faced with these criminal tax charges, Smith retained Gregory Mueller, a

sole practitioner from Colorado, to represent her at trial. Mueller had extensive

experience in criminal matters, but had never before represented a client against

federal felony or tax charges. Smith and Mueller determined their primary

defense would be that Smith had a good faith belief in the legitimacy of the

deductions recognized through the Look Back Program (rendering her false

statements non-willful), and that her failure to file a tax return for Neco &

(...continued)
Moran were reversed and remanded for new trial due to an erroneous evidentiary
ruling. *See United States v. Moran*, 493 F.3d 1002 (9th Cir. 2007). On retrial,
the Morans were acquitted.

Associates was negligent rather than willful. Following a five-day trial, Smith was found guilty on all counts.

Prior to sentencing, Smith retained new counsel and filed a motion for a new trial. Because she had been previously awarded restitution as a victim of the AAA programs in the *Anderson* prosecution, Smith argued, the government was estopped from subsequently claiming she had the requisite mental state to commit the charged crimes. Furthermore, because Mueller had failed to raise this estoppel argument, and because of certain other shortcomings in his trial strategy, discussed at greater length below, Smith argued Mueller's representation at trial amounted to ineffective assistance of counsel.

The trial court denied Smith's motion on the procedural ground that it was untimely, but also passed upon the merits of Smith's claim. It concluded Smith's characterization as a victim in the Loan 4 scheme did not preclude the government from asserting she was aware of the sham nature of her Look Back transactions, and that Mueller had presented himself as a "capable adversary" at trial, providing effective assistance. Smith was then sentenced to twenty-eight months' imprisonment and ordered to pay approximately $186,000 in restitution to the IRS. She appealed the denial of her motion for new trial, and this court affirmed on the procedural ground. *United States v. Smith*, No. 07-1044, 2008 WL 55996 (10th Cir. Jan. 4, 2008).

Smith next filed (1) a motion to vacate, set aside, or correct the sentence, pursuant to 28 U.S.C. § 2255, arguing ineffective assistance of her trial counsel had resulted in a deprivation of her Sixth Amendment rights; and (2) a motion for immediate release on bond pending resolution of the § 2255 motion. A limited evidentiary hearing was held in connection with the latter motion, and testimony was taken from Mueller regarding his trial preparation and strategy. Smith then filed a request for a full evidentiary hearing in connection with the § 2255 motion.

The district court issued a thorough order denying Smith's § 2255 motion, thereby effectively denying her hearing request as well. In its order, the district court acknowledged certain aspects of Mueller's performance at trial fell below the objective standard of reasonableness required under *Strickland,* 466 U.S. 687-88, but concluded those shortcomings caused Smith no prejudice in light of the government's overwhelming evidence of guilt. Smith applied for a COA on both the merits of her § 2255 motion and the denial of her request for a full evidentiary hearing. The district court granted a COA only as to the former.

## III. Discussion

### A. Ineffective Assistance of Counsel

#### 1. *Legal Standards*

28 U.S.C. § 2255 permits a prisoner in federal custody to challenge a

sentence imposed in violation of the Constitution or laws of the United States. Smith contends her conviction and sentence were imposed in violation of her Sixth Amendment right to effective assistance of counsel. Evaluation of her claim is controlled by the two-part rubric set forth in *Strickland*, which requires Smith to demonstrate (1) Mueller's representation fell below an objective standard of reasonableness, and (2) his deficient performance was prejudicial to Smith's defense. 466 U.S. at 687-88, 692. The district court's *Strickland* analysis presents a mixed question of fact and law, which we review de novo. *United States v. Orange*, 447 F.3d 792, 796 (10th Cir. 2006).

Because "[t]here are countless ways to provide effective assistance in any given case," *Strickland*, 466 U.S. at 689, the court starts from the presumption that counsel's performance was objectively reasonable "and that [Mueller's] challenged conduct *might* have been part of a sound trial strategy." *Bullock v. Carver*, 297 F.3d 1036, 1046 (10th Cir. 2002). "[W]here it is shown that a particular decision was, *in fact*, an adequately informed strategic choice, the presumption that the attorney's decision was objectively reasonable becomes 'virtually unchallengeable.'" *Id.* The court must also look to the totality of the evidence to determine whether Mueller's alleged shortcomings prejudiced Smith's defense. *See Boyd v. Ward*, 179 F.3d 904, 914 (10th Cir. 1999). The touchstone of this inquiry is whether "counsel's conduct so undermined the proper

functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. This court "may address the performance and prejudice components in any order, but need not address both if [Smith] fails to make a sufficient showing of one." *Boyd*, 179 F.3d at 914 (quotation omitted).

2. *The Presentations at Trial*

Smith's § 2255 claim is premised largely on Mueller's failure to present certain evidence at trial. To properly analyze the merits of her claim, then, it is necessary to first review the evidence actually presented to the jury.

The government's case sought to demonstrate Smith was aware the tax losses created through her use of the Look Back Program were invalid. To accomplish this, the prosecution presented evidence concerning (i) the evident illegality of AAA as a whole, and (ii) the sham nature of Smith's Rocky Ventures partnership. Evidence showed Smith had worked for many years in bookkeeping and tax preparation. Smith was introduced to AAA by an acquaintance after she mentioned her desire to liquidate stock holdings without incurring tax liability. Testimony indicated that upon joining AAA, she was given the so-called "Gateway" tapes, which contained recordings from AAA founder Keith Anderson's speeches and lectures. In these tapes, Anderson explains the tax protester concept of "sovereignty," according to which a taxpayer can supposedly

stop accepting the benefits of citizenship from the federal government and thereby be relieved of the duty to pay income taxes. To achieve sovereignty, Anderson recommends taxpayers rescind their social security numbers and have their children at home, so that the children do not have birth certificates. The Gateway lectures further recommend that property be purchased in gold and silver, as opposed to Federal Reserve notes, because such property need not be "registered" with the government. An acquaintance of Smith's testified she had expressed an interest in these concepts and desired to become "sovereign."

Another of the government's witnesses was a law enforcement officer who had, in connection with an undercover investigation, attended a AAA seminar in August 2000. He testified that sovereignty concepts were conveyed to the audience through a PowerPoint presentation, and that certain slides in these presentations depicted the IRS as a scorpion. Other slides showed the United States tax code in flames.

Samuel Baldwin, another government witness and Smith's former accountant, also attended the August 2000 AAA seminar. Baldwin was brought to the seminar by Smith, who sought to involve him in the organization. Baldwin testified that the presentation was very anti-government and included a slide depicting a plane full of IRS agents being shot down by a helicopter. He further testified that the basic Look Back Program was described at this seminar, and

appeared designed to create fictitious deductions. He was particularly concerned about the legitimacy of AAA because he was unable to get additional information about their programs without first joining the organization. Baldwin expressed his skepticism to Smith, who disregarded his concerns. Further testimony revealed Smith contacted Baldwin shortly prior to her trial and sought to influence his participation.

Additional testimony and exhibits were presented demonstrating that Smith had adopted AAA's tax protester doctrines. For example, before becoming an Information Officer for AAA, Smith had to complete a written examination. One question concerned ownership of property; Smith's answer on the exam stated that, to establish sovereignty, "[o]wnership of a house inside the Land Title System should be titled to a fictitious entity." Other evidence demonstrated Smith had, in fact, transferred title to her vacation home and other real property to a fictional entity called "Skyway Properties." Warranty deeds recording these transfers listed "$21 in gold coin" as consideration. Furthermore, numerous tax forms and other official documents completed by Smith were shown to have the initials "TM" beside Smith's signature: a marking prescribed by sovereignty literature.

The government also presented numerous documentary exhibits indicating Smith's partnership, Rocky Ventures, was not a real business enterprise at all, but

instead a shell created solely to generate tax losses. The partnership agreement by which Rocky Ventures was created, for example, is dated October 13, 1999. Rocky Venture's tax returns, however, on which the $1,000,000 tax loss was first claimed, state that the business was started on September 1, 1999, approximately six weeks prior to its creation and two weeks before Smith's participation in AAA began. Still more troubling, the contract by which Rocky Ventures incurred its obligation to pay Macro Media $1,000,000 for "marketing & consulting services" states that Macro Media's performance was to be completed by December 31, 1998, ten months before Rocky Ventures came into existence. Other evidence indicated Rocky Ventures engaged in no business activity whatsoever from 1999 through 2001, owned no assets, maintained no books of accounts, and received no capital contributions from its partners.

The jury was also presented with evidence concerning the circumstances of the $1,000,000 loan allegedly provided by La Maquina Blanca to Rocky Ventures and purportedly paid over to Macro Media. Documentary evidence showed no collateral was required to secure this loan, even though Rocky Ventures was a start-up company with no assets. The promissory note for the loan listed the due date as September 1, 2099, approximately 100 years after the disbursement of proceeds. An invoice accompanying the loan stated, "[w]hen the loan is approved, La Maquina Blanca, S.A. is hereby authorized to pay the loan proceeds

directly to Mason Advertising, LLC," a company with no apparent connection to Rocky Ventures.[2]

Further evidence indicated Smith did not consider the $1,000,000 loan, for which she signed on behalf of Rocky Ventures, to be a true obligation. In 2000, for example, Smith submitted an application to refinance her home mortgage. The application required Smith to list all assets and liabilities. Although the $250,000 Smith invested into AAA's Loan 4 was listed as an asset, the application does not mention the $1,000,000 loan as a liability. Other evidence on this point included the testimony of Robert Haueisen, a AAA client for whom Smith served as Information Officer and whose version of the Look Back Program required him to sign for a $750,000 promissory note. When Haueisen expressed doubts about taking on such a large liability, Smith advised him the loan would not have to be repaid.

Smith's defense, in turn, sought to prove Smith had a good faith belief in the legitimacy of her deductions and was an unwitting victim of AAA. To that end, Mueller elicited witness testimony regarding the *Anderson* prosecution, the criminal judgments entered against AAA's principals, and Smith's prior adjudication as a victim of the Loan 4 scheme. Mueller emphasized that Richard

---

[2]   Record evidence not presented at trial indicates that Macro Media and Mason Advertising were apparently different names used by AAA to describe the same entity.

Marks, AAA's lead accountant, had told AAA clients the programs were legal, and sought to demonstrate it was reasonable for Smith to rely on these representations.

Mueller also presented the testimony of George Benoit, an IRS-licensed tax expert and the preparer of Smith's tax forms. Benoit testified he had looked into the legitimacy of the Rocky Venture tax losses and had satisfied himself that they appeared legal. In reaching this conclusion, Benoit testified, he had in part relied upon conversations with Richard Marks.[3] Testimony was also elicited from Alan Gavel, an accountant and tax attorney, who described his investigation of the victimization of AAA's Look Back Program clients. Mr. Gavel, however, was prevented from testifying that Smith was personally a victim of the Look Back Program, due to certain of Mueller's oversights discussed below.

Further testimony was given by Michael Skillo and Kirby Clock, two former AAA clients, who had also participated in the Look Back Program. Mr. Skillo testified to his good faith belief in the legitimacy of the partnership losses

---

[3] Government cross-examination, however, revealed Benoit had suspected the partnership loans were unfunded, recognized the partnership documents were back-dated, and believed the Sixteenth Amendment (allowing Congress to levy an income tax without apportionment among the States) had never been properly ratified. *See* U.S. Const. amend. XVI.

he recognized through the Look Back Program. Mr. Clock also testified that Smith had told him the partnership loans involved in the Look Back Program would have to be repaid.

Finally, Smith herself testified for the limited purpose of introducing United States Postal Service receipts for 2003 and 2005 tax returns filed by Neco & Associates. On cross-examination, however, it was elicited that these returns were signed by Smith, and that beside her signature was the phrase "under duress." When asked to explain the significance of this notation, the following colloquy ensued:

Q. What does "Under duress" mean?

A. I had to file this tax return, is that right? I am required to file it. Am I required to file this tax return?

Q. I get to ask the questions, you get to answer.

A. "Under duress," in my opinion, which I read for through some different publications and stuff, that I cannot file this tax return without it being under the penalty of perjury. I am concerned about the tax laws, that I'm not – they are so complex that I am not able to follow the tax laws. I don't have a problem filing my tax returns.

3. *The Alleged Shortcomings*

Smith argues Mueller's trial preparation and performance were objectively deficient for the following reasons: (1) inadequate preparation time, including failure to thoroughly review discovery; (2) failure to introduce evidence of a

-17-

conversation in which Richard Marks allegedly states he kept the illegality of AAA programs secret from Information Officers, such as Smith (the "Marks Transcript"); (3) failure to introduce a confession signed by AAA founder, Keith Anderson, in which he states his leadership of AAA was "incompetent and destructive" (the "Anderson Confession"); (4) failure to authenticate and introduce the victim lists from the *Anderson* prosecution; (5) failure to introduce check receipts evidencing Smith's payment to AAA of loan commitment fees for her participation in the Look Back Program; (6) failure to establish foundation for admission of AAA's "Tax Magic" infomercial and related materials; (7) failure to comply with rules concerning the pre-trial disclosure of expert testimony; (8) failure to rebut certain aspects of the government's evidence of willfulness; and (9) failure to properly counsel Smith regarding the need for, and consequences of, her testimony at trial.

Smith contends these shortcomings prevented Mueller from effectively presenting her defense. The Marks Transcript, for example, contains a secretly tape-recorded conversation between lead AAA accountant Richard Marks and an undercover IRS agent from October 2000. In the transcript, Marks discusses future planning strategies being developed by AAA accountants, and states that "we don't tell Jim and Pam [Moran], or any of the IOs, what we're working on in detail" because "some of the stuff we say [in AAA planning conferences]

shouldn't be published because it's illegal, but we still discuss the illegal and how do we make it legal." Smith argues this evidence proves she was kept in the dark regarding the illegality of the Look Back Program, and lends credence to her claim of good faith belief in the validity of her Rocky Ventures tax losses.

Similarly, Smith argues, the victim lists from the *Anderson* prosecution listing her as a victim of AAA's Loan 4 scam and the check receipts indicating she had paid AAA $50,000 for her participation in the Look Back Program demonstrate she was taken advantage of by a sophisticated scam. Although Mueller referred to this evidence in his opening statement, neither the victim lists nor the check receipts were introduced at trial. Mueller's opening statement additionally promised the jury it would hear testimony from tax expert Alan Gavel, who allegedly was prepared to testify that Smith was a victim of the Look Back Program. Because Mueller had failed to provide the government a written summary of Gavel's proposed expert testimony as required by Fed. R. Crim. P. 16, and because Gavel had based his opinion upon a report he had not personally prepared, the trial court did not permit Gavel to testify about Smith. Mueller's failure to present this evidence to the jury, Smith asserts, prejudiced her defense not only by its absence, but also because Mueller announced he would be presenting it in his opening statement.

Smith also claims Mueller prejudiced her defense by failing to introduce materials, including a video, progress reports, and revenue projections relating to AAA's "Tax Magic" program. Tax Magic refers to a program of "50 highly effective tax reduction strategies" and a related 1-900 tax advice number that AAA was allegedly producing for sale to the public. The program was to be marketed through a polished infomercial narrated by an individual claiming to be a former IRS revenue agent; the narrator assures the audience his tax strategies are completely legal. Some evidence indicates the Tax Magic program was the product to be marketed by Macro Media pursuant to its agreements with Rocky Ventures, and that AAA produced a series of progress reports and revenue projections creating the impression that Tax Magic would be a viable business.[4] Smith argues these materials corroborated her good faith belief that Rocky Ventures and Macro Media would actually carry on business operations, and thereby validate her tax losses. The Tax Magic materials, however, were never presented to the jury because the defense witness intended to provide foundation ultimately could not do so.

Smith also attributes prejudicial effect to Mueller's failure to rebut certain aspects of the government's evidence that Smith was aware her partnership

---

[4]    The government, however, argues that Tax Magic had no connection to Rocky Ventures, and that Macro Media's marketing agreement called for it to market the Gateway tapes, which the district court found lack the veneer of legality that the Tax Magic materials convey.

venture was a sham. For example, the invoice recording La Maquina Blanca's purported $1,000,000 loan to Rocky Ventures states the loan proceeds will be paid to Mason Advertising, rather than Macro Media, and the government pointed to this inconsistency as inculpatory evidence. Smith believes Mueller prejudiced her defense by failing to rebut the government's use of this invoice by explaining that Macro Media and Mason Advertising were the same entity. Similarly, Smith argues the government's use of the absence of business records and audits for Rocky Ventures as inculpatory evidence could have been rebutted by the "innocent explanation that these terms of the partnership agreement were simply inapplicable until Rocky Ventures began receiving proceeds" from Macro Media's marketing efforts. The evidence that Smith advised her AAA clients the Look Back Program loans would never have to be repaid, in turn, could have been explained as a reference to the side agreement in which Macro Media contracted to repay the bank loan itself in the event its marketing effort produced insufficient proceeds.

Finally, Smith contends Mueller was prejudicially ineffective in his counsel regarding her decision whether to testify at trial. Mueller advised Smith he thought her testimony was necessary for two reasons: (1) for the jury to "at least hear her voice and see her demeanor on the stand," and (2) to introduce postal receipts evidencing the mailing of Neco & Associates' tax returns. Mueller was

apprehensive, however, that if Smith testified to her involvement with AAA, her radical views on taxation and "sovereignty" would be elicited on cross-examination and damage her case. Accordingly, once Smith decided to take the stand, Mueller worked with her to prepare a script for her direct testimony designed to minimize the scope of cross-examination and avoid potentially damaging testimony. Despite this script, and over Mueller's objections, the government cross-examined Smith concerning the contents of the Neco & Associates tax return, ultimately eliciting Smith's explanation of her handwritten notation, "Under Duress."

Although a criminal defendant's decision whether to testify lies squarely with the defendant, defense counsel "should inform the defendant that he has the right to testify . . . [and] discuss with the defendant the strategic implications of choosing whether to testify." *Cannon v. Mullin*, 383 F.3d 1152, 1171 (10th Cir. 2004). Smith argues Mueller's counsel in this area fell below an objective standard of reasonableness for several reasons. First, the postal receipts introduced by Smith's direct testimony could also have been authenticated by a postal service custodian of records, pursuant to Fed. R. Evid. 803(6), thereby eliminating one of the reasons Mueller recommended Smith testify. Second, the contents of the Neco & Associates tax returns were determined by the trial court to be an appropriate topic for the government's cross-examination, and Mueller

was incorrect to conclude otherwise. Third, because Mueller incorrectly concluded that the contents of the Neco & Associates tax returns could not be discussed on cross-examination, he failed to prepare Smith for the government's cross-examination. Fourth, Mueller counseled Smith against testifying about her involvement in AAA because Smith remained convinced Keith Anderson and the other AAA principals had been wrongly convicted; he consequently feared that if the government were able to cross-examine Smith on AAA-related matters, her responses would be damaging. Had Mueller discovered the Anderson Confession, Smith argues, her opinion of Anderson might have changed, thereby opening up new areas for testimony. Together, Smith contends, these shortcomings contributed to her decision to give limited testimony at trial, led to the government's allegedly damaging cross-examination, and prejudiced her defense.

### 4. *Analysis of Alleged Prejudice*

Even assuming each of the shortcomings identified by Smith constituted performance falling below the objective standard of reasonableness required by *Strickland,* the district court's denial of relief must be affirmed because Smith has not demonstrated a reasonable probability that these shortcomings impacted the outcome of her trial. The second prong of the *Strickland* analysis requires the court to aggregate the impact of counsel's errors in assessing prejudice, but for purposes of analysis, it remains necessary to address each alleged shortcoming

-23-

individually.  *See Cargle v. Mullin*, 317 F.3d 1196, 1212 (10th Cir. 2003).

The consequence of Mueller's allegedly inadequate preparation that, at first blush, appears most serious is his failure to identify and utilize the Marks Transcript.  Smith attributes great exculpatory value to the Marks Transcript, which can arguably be read as evidence that Information Officers (including Smith) were not informed of the illegality of AAA's programs by its principals.[5] Upon analysis, however, it is clear the Marks Transcript would not have impacted the outcome of the trial.  The crux of Smith's three false statement convictions is that she was aware her Rocky Ventures losses were invalid at the times she claimed them.  Smith first claimed the invalid Rocky Ventures losses in April 2000, one month before she took the written examination to become an Information Officer.  The information given to, or concealed from, Information Officers regarding the legality of the Look Back Program is consequently irrelevant to the question whether Smith made the first charged false statement knowingly.  Because the jury, by finding Smith guilty of the first false statement charge, concluded Smith was aware her Rocky Ventures losses were invalid even before she became an Information Officer, and because the Marks Transcript at

[5]    An equally plausible interpretation, however, is that Marks and the other accountants did not reveal the details of prospective AAA programs until they were ready for implementation.  For instance, although Marks at one point states that "we don't tell Jim and Pam, or any of the IOs, what we're working on in detail," he later explains that "[w]hat we say in [our planning sessions] goes no further until we walk out there and tell them."

best indicates that Smith was not given *additional* inculpatory information before she made her subsequent charged false statements, no prejudice can flow from its omission at trial.

Similarly, Mueller's failure to discover and introduce the Anderson Confession cannot be said to have prejudiced Smith's defense. The Anderson Confession discusses only the Loan 4 Program and Anderson's mis-management of AAA; it says nothing about the Look Back Program or Smith's involvement in AAA. Smith suggests the discovery of the Anderson Confession might have disabused her of the notion that Anderson was a good person who would be exonerated on appeal, and thereby caused her to testify differently at trial. Whether Smith's testimony would, in fact, have changed, and whether her modified testimony would have increased her chances of acquittal, however, are matters of pure speculation, clearly insufficient to carry Smith's burden of proving prejudice. *See Boyle v. McKune*, 544 F.3d 1132, 1140 (10th Cir. 2008).

The same reasoning prevents us from identifying any prejudicial consequence of Mueller's inability to introduce the expert testimony of Alan Gavel. Smith has never offered any affidavit or other indication of the contents of the expert testimony expected if Mueller had secured its admission. Whether such expert testimony would have been exculpatory and persuasive to the jury is unknown.

Nor have prejudicial effects been shown to flow from Mueller's failure to offer Smith's after-the-fact rebuttals to the government's evidence of willfulness. When the government presented the La Maquina Blanca invoice indicating the Rocky Ventures loan proceeds would be transferred to Mason Advertising, Mueller certainly *could* have attempted to rebut the inculpatory use of the document by pointing out that Mason Advertising and Macro Media were simply different names used by AAA to refer to the same entity. For such a rebuttal to be effective, however, Mueller would also have had to demonstrate Smith was aware of this fact at the time. The record provides no indication this is so. By the same token, when Robert Haueisen testified Smith had repeatedly advised him his Look Back loan would never have to be repaid, Mueller *could* have asked on cross examination whether Smith might have been referring to the side agreement whereby Macro Media promised to repay the loan in the event its marketing efforts generated insufficient proceeds. The court has no way of knowing, however, what the witness's response would have been. Finally, in response to the government's reliance on the absence of business records, banking activity or annual audits for Rocky Ventures, Smith argues Mueller should have offered "the innocent explanation that these terms of the partnership agreement were simply inapplicable until Rocky Ventures began receiving proceeds" from its marketing efforts. Nothing in the partnership documents, however, so provides.

The government's cross-examination of Smith, furthermore, was nowhere near as damaging as Smith claims. Smith's response to the government's cross-examination on the "under duress" notation essentially expressed her unremarkable understanding that tax returns must be filed, and must be filed under penalty of perjury. Smith also stated she did not "have a problem filing [her] tax returns." Precisely how this response prejudiced Smith's defense eludes the court. The only damage to Smith's defense apparent from the record is that the government's cross-examination served to bring the "under duress" notation to the jury's attention, thereby possibly confirming Smith had adopted AAA's sovereignty concepts. The government's case, however, was replete with other proof of Smith's tax protester beliefs, including evidence Smith had transferred real estate to fictional entities for gold coin, signed tax return documents with the "TM" marking, repeatedly expressed an interest in sovereignty concepts to her acquaintances, and served as an Information Officer for AAA. The jury had, in fact, been shown other tax returns filed by Smith and bearing the same "under duress" notation even before Smith took the stand. Smith has consequently failed to demonstrate how she was prejudiced by her testimony on cross-examination.

The remaining shortcomings identified by Smith can at least be said to have had *some* negative impact on her defense. The introduction of check receipts indicating Smith's $50,000 loan origination payment to AAA, for example, might

have provided support for her alleged good faith belief in the legitimacy of the loan. Similarly, the victim lists from the *Anderson* prosecution, while only directly indicative of her victimization in the Loan 4 scam, at least partially corroborated Smith's argument that she was also a victim of the Look Back Program.[6] The Tax Magic infomercial and materials, too, could have provided support for Smith's claimed belief in the legitimacy of Rocky Ventures business purpose.

Nevertheless, the combined effect of these alleged shortcomings do not give rise to a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In this context, demonstrating a reasonable probability "requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Cullen v. Pinholster*, No. 09-1088, 2011 WL 1225765, at *12 (U.S. Apr. 4, 2011) (quoting *Harrington v. Richter*, 131 S. Ct. 770, 791 (2011)). Whether Smith has satisfied this high threshold must, moreover, be determined with reference not only to trial counsel's alleged shortcomings, but also to the strength of the prosecution's case. *Boyd*, 179 F.3d at 914. Here, the latter is overwhelming and largely unrebutted. Even now, no justification has been given for the eminently fraudulent, back-

---

[6]     The negative impact of Mueller's failure to introduce this evidence, however, is mitigated because Mueller was able, through cross-examination of a government witness, to elicit other testimony indicating Smith was a victim of the Loan 4 scam and had lost over $200,000.

dated documentation purporting to form the Rocky Ventures partnership or its marketing agreement with Macro Media. No reason has been offered why Smith, a sophisticated business owner with many years experience in bookkeeping and tax preparation, was not suspicious that La Maquina Blanca would provide a $1,000,000 loan to her start-up business without requiring any collateral and without requiring any payments before the expiration of the loan's 100-year term. No explanation was given for Smith's failure to report this loan as a liability on her mortgage-refinancing application, and no attempt has been made to articulate why neither Macro Media, Rocky Ventures, nor Smith herself ever did anything to advance their purported business. In short, Smith has provided no plausible interpretation of this evidence to counter the implication that she formed Rocky Ventures solely as a tax haven and used it to generate tax losses she knew were fraudulent.

Because correction of Mueller's allegedly unprofessional errors would do little to offset the weight of the government's case, Smith has not shown there is "a reasonable probability that" the result of the trial would have been different. *Strickland*, 466 U.S. at 694. The district court's order denying Smith's § 2255 motion is affirmed.

B.     Motion for an Evidentiary Hearing

Following a limited evidentiary hearing on Smith's motion for release on

bond pending resolution of her § 2255 motion, at which Mueller's testimony was taken, Smith submitted a motion (the "Hearing Motion") requesting, in the event habeas relief was not granted based on the record and briefings, a full evidentiary hearing be held. The Hearing Motion indicated Smith would use the evidentiary hearing to more fully examine Mueller, and to present the testimony of William Cohan, an expert witness, in support of her ineffective assistance of counsel claim. [7] By its order denying Smith's § 2255 motion, the district court effectively denied the Hearing Motion sub silentio. Smith now challenges the merits of this denial, which we treat, in connection with her notice of appeal, as an application for a COA. *See* Fed. R. App. P. 22(b)(2); 28 U.S.C. § 2253(c)(1)(B) (providing no appeal may be taken from a "final order in a proceeding under section 2255" unless the movant first obtains a COA).

For this court to grant a COA and proceed to the merits of Smith's appeal, she must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A § 2255 petitioner, in turn, is entitled to an evidentiary hearing unless "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." *Id.* § 2255(b). For the reasons discussed above, the records of this case conclusively show Smith's defense was

_____

[7] Smith did not indicate what Cohan was expected to testify to if a hearing had been granted. His previously submitted declaration in support of Smith's § 2255 motion, however, largely repeats the arguments made in the motion itself.

-30-

not prejudiced by Mueller's performance, and Smith was consequently not entitled to relief under § 2255. The district court, therefore, did not abuse its discretion in determining Smith was not entitled to an evidentiary hearing. Smith has thus failed to make a substantial showing that the denial of her Hearing Motion resulted in a denial of her constitutional rights. The application for a COA is denied.

## IV. Conclusion

For the foregoing reasons, the district court's denial of habeas relief is **AFFIRMED**, and Smith's application for a COA is **DENIED**.

ENTERED FOR THE COURT

Michael R. Murphy
Circuit Judge